## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division of Maryland)

| | |
|---|---|
| **CLAUDIA HARBOURT** | Civil Action Number: |
| 14700 Seneca Castle Court | |
| North Potomac, MD 20878 | Request for Jury Trial |
| *Resident of Montgomery County* | |
| | Collective Action – Federal Law |
| **MICHAEL LUKOSKI** | |
| 412 Kosoak Road | Class Action – Maryland Law |
| Middle River, MD 21220 | |
| *Resident of Baltimore County* | |
| | |
| **URSULA POCKNETT** | |
| 4040 Doncaster Drive | |
| Indian Head, MD 20640 | |
| *Resident of Charles County* | |
| | |
| Plaintiffs | |
| | |
| v. | |
| | |
| **PPE CASINO RESORTS** | |
| **MARYLAND, LLC** | |
| 601 E. Pratt Street | |
| 6th Floor | |
| Baltimore, MD 21202 | |
| | |
| d/b/a:  MARYLAND LIVE! CASINO | |
| 7002 Arundel Mills Circle | |
| Hanover, MD 21076 | |
| | |
| Serve:  Resident Agent | |
| CSC-Lawyers Incorporating | |
| Service Company | |
| 7 St. Paul Street, Suite 1660 | |
| Baltimore, MD 21202 | |
| | |
| Defendant | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT FOR WAGES OWED

CLAUDIA HARBOURT, MICHAEL LUKOSKI and URSULA POCKNETT,

Plaintiffs, by and through their undersigned counsels and The Law Offices of Peter T.

Nicholl, hereby submit their Complaint against PPE CASINO RESORTS MARYLAND,

LLC, d/b/a MARYLAND LIVE! CASINO, Defendant, to recover unpaid wages,

liquidated damages, interest, reasonable attorneys' fees and costs under Section 16(b) of

the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.*

(hereinafter, "FLSA"); unpaid wages, interest, reasonable attorneys' fees and costs under

Maryland Wage and Hour Law, Maryland Code Annotated, Labor and Employment §§ 3-

401 *et seq.* (hereinafter, "MWHL"); and unpaid wages, treble damages, interest,

reasonable attorneys' fees and costs under the Maryland Wage Payment and Collection

Act, Maryland Code Annotated, Labor and Employment §§ 3-501 *et seq.* (hereinafter,

"MWPCA"), and in support thereof, state as follows:

**INTRODUCTION AND BACKGROUND**

This matter stems from a scheme devised by Defendant to avoid paying Plaintiffs

and others similarly situated their wages owed.  As described herein, Defendant PPE

Casino Resorts Maryland, LLC, d/b/a Maryland Live! Casino (hereinafter, referred to as

"Defendant" and/or "Maryland Live!") is in the business of commercial gaming.  On

November 6, 2012, the passing of Question 7 by the Maryland Legislature caused the

expansion of gambling in Maryland by legalizing the operation of table games.  This

meant the potential for new jobs for Maryland residents.  What this meant for Defendant

was the urgent need to train and hire table game dealers.  Without trained table game

dealers, Maryland Live! could not begin to generate revenues from the table games that

were already constructed for their casino.

Executives of Maryland Live! knew they needed to move quickly if they were going to have table games operating by the spring of 2013; the timeframe in which the passing of Question 7 authorized table games to begin. Defendant did not have dealers for the approximately one hundred and fifty (150) live table games set up at their casino. Approximately eight hundred and thirty one (831) dealer positions needed to be filled immediately in order for Maryland Live! to begin operating table games.

To recruit and procure employees, in mid-November of 2012, Defendant began advertising employment opportunities by means of the internet, the newspaper and television. This began immediately after Question 7 was passed. However, because different casinos implement different methods concerning how to operate table games, Defendant needed to develop a training course that would ensure that Plaintiffs and others similarly situated would be equipped to perform duties specific to dealing at Maryland Live!. Therefore, Defendant immediately developed what they labeled to be a free twelve (12) week table games "dealer school." Defendant advertised that that the school was held in conjunction with Anne Arundel County Community College (hereinafter, "AACC"). Defendant also advertised that the school was for the purpose of providing qualified applicants with the skills necessary to embark on a career at Maryland Live!.

Applications for the job training program were submitted to marylandlivecasino.com, not AACC. Howard Weinstein, Maryland Live! Vice President, stated prior to the commencement of the program that "[r]ight now we have over 9,000 resumes and have over 3,000 interviews scheduled in the next three weeks."

The training program was run out of Marley Station Mall (hereinafter, referred to as "Marley Station"), a strip mall south of Baltimore City. It started on January 7, 2013 and ran until the beginning of April. Students had absolutely no contact with professors, or any staff, from AACC. All classes were taught by Maryland Live! employees. These instructors wore Maryland Live! uniforms and all course materials were authored by Maryland Live!. Maryland Live! even set up a temporary human resources office next to the training program in the strip mall to assist the trainees with their applications for their gaming license. This was to ensure that the trainees had the necessary employment documents completed prior to their completion of the course so they could begin working immediately once the training program ended.

The sole purpose of Defendant's temporary makeshift "school" was to hire the exact number of dealers needed to fill the vacant table game positions at Maryland Live!. Once the training program was complete and Maryland Live! filled the open positions, the training program was never offered again. Defendant disguised its employee-training course as a school for the purpose of not paying Plaintiffs and others similarly situated participating in the job training program.

For instance, even trainees who failed to complete the training program were still given certificates of completion. These circumstances make clear that the issuance of these certificates was a sham. Due to Defendant's urgent need for dealers, Plaintiffs and others similarly situated did not even need to meet all the course requirements in order to receive certificates of completion. In their attempt to disguise the employee-training course as a school, the certificates were merely a prop used by Defendant to evade the payment of wages owed to Plaintiffs and others similarly situated. Masking the training

course as a school did not relieve Defendant of its legal obligation to pay the minimum wage.

## THE PARTIES

1.     Plaintiffs bring suit in this Honorable Court for the adjudication of their claims stemming from and relating to violations of the FLSA, MWHL and the MWPCA as residents of Maryland against Defendant, an employer located in Maryland.

2.     Plaintiff Claudia Harbourt (hereinafter, "Plaintiff Harbourt") is an adult resident of Montgomery County, Maryland.

3.     Plaintiff Michael Lukoski (hereinafter, "Plaintiff Lukoski") is an adult resident of Baltimore County, Maryland.

4.     Plaintiff Ursula Pocknett (hereinafter, "Plaintiff Pocknett") is an adult resident of Charles County, Maryland.

5.     Defendant PPE Casino Resorts Maryland, LLC (hereinafter, "PPE Casino") is an incorporated for-profit business in Maryland.   Defendant owns and operates Maryland Live! Casino (hereinafter, "Maryland Live!), located in Hanover, Maryland.

6.     Defendant is subject to the FLSA and MWHL by the nature of its business enterprise and the amount of revenues generated.   Defendant's annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00).

7.     At all times relevant to this Complaint, Plaintiffs engaged in interstate commerce by the nature of their duties performed as part of their employment with Defendant.

8.      Plaintiffs worked for Defendant, who, at all times throughout Plaintiffs' employment, fell within the purview of the term "employer" under the FLSA, 29 U.S.C. § 203(d) and MWHL, § 3-401(b).  Plaintiffs and others similarly situated worked as non-exempt employees for Defendant.

9.      From January 7, 2013 until approximately March 1, 2013, Plaintiff Harbourt was employed with Defendant.

10.     From January 7, 2013 until approximately May 1, 2013, Plaintiff Lukoski was employed with Defendant.

11.     From January 7, 2013 until approximately March 22, 2013, Plaintiff Pocknett was employed with Defendant.

12.     At all times relevant to this Complaint, Defendant supervised the administration of its business and set employee schedules, including Plaintiffs' schedules; Defendant was actively engaged in the management and direction of Plaintiffs. Defendant possessed and exercised authority to determine hours worked with respect to its employees, including Plaintiffs.  Defendant made all decisions relating to Plaintiffs' rates and method of pay.

## JURISDICTION AND VENUE

13.     Original jurisdiction in this Honorable Court is expressly provided by FLSA, 29 U.S.C. § 207, *et seq*.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1331.

14.     Pursuant to 28 U.S.C. § 1391 (b), venue is appropriate.  The unlawful acts central to this matter occurred within the State of Maryland.

## FACTUAL ALLEGATIONS FOR ALL CLAIMS

15.     On November 6, 2012, Question 7 was passed by the Maryland Legislature, which authorized table games to be conducted at casinos within the State of Maryland. This necessitated that Defendant recruit and train employees for purposes of preparing for the arrival of approximately one hundred and fifty (150) table games at Maryland Live!.

16.     Defendant created more than eight hundred (800) new jobs to accommodate the introduction of table games. Passage of the referendum necessitated that Defendant train its prospective employees quickly in order for them to be equipped to perform table games by the spring of 2013.

17.     Immediately after the passage of Question 7, to procure the necessary employees to begin operating table games, Defendant began to advertise via the internet, the newspaper and television.  Defendant also conducted informational sessions at various hotels in Maryland.  These sessions were held between November 20 and December 6, 2012. The purpose of these sessions was for Defendant to provide potential employees with details regarding the dealer positions at Maryland Live!, and the training program potential employees would need to complete in order to procure the skills needed to operate table games at Maryland Live!.

18.     Plaintiffs and others similarly situated submitted an application and were subsequently contacted for an interview by a Maryland Live! employee.  The interviews took place in Glen Burnie, Maryland at Marley Station in approximately December of 2012.

19.     The interviews were all conducted by Maryland Live! employees. Each interview consisted of a congeniality test, in which a Maryland Live! employee asked

Plaintiffs and others similarly situated questions in order to assess their personality. The interviews also consisted of basic mathematical testing, in which Plaintiffs and others were tested on how well they could "think on their feet" when presented with simple equations.

20.     Plaintiffs and others similarly situated completed the interviews successfully. Based on this, following the interviews, Plaintiffs were asked by agents of Defendant if they would like to attend a course to become a dealer at Maryland Live!. It was explained that the course was for a span of twelve (12) weeks and that Plaintiffs and others would learn how to conduct table games for Maryland Live!.

21.     There were approximately ten thousand (10,000) applicants who applied for the dealer position at Maryland Live!. Out of this pool of applicants, approximately eight hundred and thirty one (831) were given the option to attend the dealer course offered by Maryland Live!. The number of individuals invited to join the program were almost identical to the number of employees Defendant needed to operate table games at their casino.

22.     Plaintiffs were part of this pool of eight hundred and thirty one (831). The remaining persons within this pool are all members of the putative class.

23.     Defendant's agents advised Plaintiffs and putative class members that the training course was developed in conjunction with AACC. However, Defendant stated to Plaintiffs and potential class members that they were part of the fortunate few selected to attend the course at Marley Station. Plaintiffs and the putative class were advised that they were fortunate because the training course offered at Marley Station was free.

24.     The training program began on January 7, 2013 and ended on April 14, 2013, which is the period relevant to this Complaint. In addition to Plaintiffs, all persons that attended the course, regardless of the number of days or weeks attended, represent the putative class.

25.     The schedule for the program was Monday through Friday, for approximately four (4) hours each day. The time slots offered for the course were from 8:00 a.m. to 12:00 p.m., 12:00 p.m. to 4:00 p.m., 4:00 p.m. to 8:00 p.m., or from 8:00 p.m. to midnight.

26.     Defendant advised Plaintiffs and others similarly situated that the course schedule was Monday through Friday, four (4) hours a day, resulting in a total of twenty (20) hours a week.   However, Plaintiffs and others' hours of attendance ended up being more than twenty (20) hours a week. This resulted from numerous delays that can be attributed to the Maryland Live! staff.

27.     The course was centered on Plaintiffs and others similarly situated learning blackjack, craps, roulette and baccarat.   The course was specific to the manner in which Defendant's employees are to perform these table games at Maryland Live!. The instructors were all employees of Maryland Live!.  The course materials were all authored by Maryland Live!.

28.     Prior to their completion of the course, at various periods, Defendant demanded that Plaintiffs and others similarly situated fill out numerous forms in regards to their employment as a dealer at Maryland Live!. This included a direct deposit and a W-2 form so that they could be issued checks by Maryland Live! once training was complete. This also included Plaintiffs and others all having to pay twenty-four dollars

($24.00) in order for Defendant to obtain their driving records as part of Plaintiffs' background check.

29.     During their attendance of the course, Plaintiffs and others similarly situated were also all subject to a criminal background check; Plaintiffs and others fingerprints were taken and they also had to disclose their social security numbers and other personal identifiers. A drug test, a financial background check and confirmation of Plaintiffs and others highest levels of education were also necessary prior to their completion of the course.

30.     Defendant maintained a human resources department adjacent to the classrooms at Marley Station. This was structured so that members of the department could facilitate Plaintiffs and others with completing the necessary employment documents while simultaneously completing the training course. All members of the human resources department were employees of Maryland Live!.

31.     From January 7, 2013 until approximately March 1, 2013, Plaintiff Harbourt was employed with Defendant. Harbourt attended the training course for approximately eight (8) weeks. Harbourt's hours of attendance were from 12:00 p.m. to 4:00 p.m. Monday through Friday.

32.     From January 7, 2013 until approximately May 1, 2013, Plaintiff Lukoski was employed with Defendant. Lukoski attended the training course for the full twelve (12) weeks. Lukoski's hours of attendance were from 12:00 p.m. to 4:00 p.m. Monday through Friday.

33.     From January 7, 2013 until approximately March 22, 2013, Plaintiff Pocknett was employed with Defendant. Pocknett attended the training course for

approximately eleven (11) weeks. Pocknett's hours of attendance were from 12:00 p.m. to 4:00 p.m. Monday through Friday.

34.     Through their attendance at the course, Plaintiffs satisfied the requirements of their job and adequately performed their duties to benefit the Defendant, as well as Defendant's potential patrons.

35.     Defendant was responsible for determining Plaintiffs' rates and method of pay. Defendant also made all decisions relating to Plaintiffs' work/training schedules.

36.     Due to the structure of the course, Plaintiffs and others similarly situated consistently worked at least twenty (20) hours in a workweek.

37.     There is no bona fide dispute that Plaintiffs and others similarly situated are owed at least the minimum wage for all hours worked in a workweek. At no time did Plaintiffs' duties include work for Defendant that would make them exempt from the FLSA and MWHL provisions requiring that they be paid the minimum wage.

38.     Defendant, acting without good faith, withheld wages owed to Plaintiffs and others similarly situated. Defendant knew that Plaintiffs typically worked at least twenty (20) hours per week and suffered or permitted Plaintiffs to work at least twenty (20) hours a week.

39.     Other then for the final two (2) days of training, Plaintiffs and others were not paid any wages for their time of attendance at the training course. Only the Plaintiffs and those similarly situated that still remained in the course on the twelfth week, on the last two (2) days of that workweek, received the minimum wage of seven dollars and twenty-five cents ($7.25) per hour for their attendance on these days.

40.     As Plaintiff Lukoski attended the course for the full twelve (12) weeks, Lukoski was paid for two (2) days of training.  These exact circumstances exist for other members of the putative class who attended the course for the full twelve (12) weeks.

41.     Defendant did not begin to pay Plaintiff Lukoski and those similarly situated who completed the twelve (12) week course regularly until Defendant could begin to operate their table games.  This occurred on approximately April 26, 2014.

42.     As Plaintiff Harbourt only attended the course for eight (8) weeks, and Plaintiff Pocknett only attended the course for eleven (11) weeks, Defendant failed to pay these Plaintiffs any wages.  These exact circumstances exist for other members of the putative class who did not complete the course.

43.     In bad faith, Defendant withheld wages owed to Plaintiffs and others similarly situated, even after Plaintiffs and others inquired about Defendant's failure to pay them for their attendance at the training course.

44.     Thus, Plaintiffs seek their wages owed and other available relief through this Complaint.

## COLLECTIVE ACTION ALLEGATIONS UNDER THE FLSA

45.     Pursuant to 29 U.S.C. §216(b), this matter is concurrently maintainable as an "opt-in" collective action to recover unpaid wages and other available relief.  Plaintiffs commence this collective action on behalf of themselves and others similarly situated.

46.     Plaintiffs consent to be parties to this matter; their consent forms are attached to this Complaint as Exhibits A through C.

47.     In addition to Plaintiffs, there are numerous current and former employees of Defendant who are similarly situated.  These employees were subject to Defendant's

same unlawful practices. These employees were not paid for attending Defendant's training course.

48.     Upon information and belief, these employees will choose to join Plaintiffs in this action against Defendant and opt-in to this lawsuit to recover unpaid wages and other available relief.

49.     These similarly situated employees are known to Defendant and are readily identifiable through Defendant's records. Said employees would benefit from the issuance of court-supervised notice.

50.     Thus, these similarly situated employees should be notified of and allowed to opt-in to this action for the purpose of adjudicating their claims.

## CLASS ACTION ALLEGATIONS UNDER MARYLAND WAGE LAWS

51.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action as a class on behalf of themselves and others who have been employed by Defendant. Said employees were subject to the same unlawful practices and policies described in this Complaint. These policies and practices are direct violations of MWHL and the MWPCA. Similar to Plaintiffs, these former employees were not paid the applicable minimum wage for attending the training course described herein.

52.     Plaintiffs' counsel are competent and experienced in litigating class actions and other complex litigation matters, including wage and hour matters similar to the present controversy. Counsel are capable of providing adequate representation for all members of the proposed class.

53.     Plaintiffs are members of the proposed class they seek to represent. Plaintiffs will fairly and adequately protect the interests of the class.

54.    The potential members of the class are so numerous that joinder of all class members is impractical.

55.    There are questions of law and fact common to the class that predominate over any questions affecting only individual class members.

56.    Plaintiffs' claims are typical of the claims of the potential class members.

57.    A class action is superior to other available methods for the fair and efficient adjudication of this case and will serve to promote judicial economy to the benefit of this Court, as well as the involved parties.

58.    As such, class certification is appropriate.

## CAUSES OF ACTION AND VIOLATIONS OF LAW

### *Count I. Violation of the FLSA:  Failure to Pay the Minimum Wage*

59.    Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

60.    Pursuant to the Fair Labor Standards Act, 29 U.S.C. § 206, each employer shall pay wages at a rate that is no less than the federal minimum wage, currently amounting to seven dollars and twenty-five cents ($7.25) per hour.

61.    Plaintiffs have not received compensation from Defendant reflecting the prescribed minimum wage rate for hours worked for Defendant; rather, Defendant unlawfully failed to ensure that Plaintiffs received at least the minimum wage rate for each hour of work.

62.    Defendant willfully and intentionally did not compensate Plaintiffs for the total minimum amount of wages they are owed.  There is no bona fide dispute that

Plaintiffs are not exempt from the minimum wage provisions of the FLSA for the work they performed for Defendant.

63.    Under the FLSA, Plaintiffs are entitled to wages from Defendant for all hours worked at a rate of pay no less than the federal minimum wage.

### Count II. Violation of MWHL: Failure to Pay the Minimum Wage

64.    Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

65.    Pursuant to Maryland Wage and Hour Law, Maryland Labor and Employment Code Ann. § 3-415, each employer shall pay wages at a rate that is no less than the federal minimum wage, currently amounting to seven dollars and twenty-five cents ($7.25) per hour.

66.    Plaintiffs have not received compensation from Defendant reflecting the prescribed minimum wage rate for hours worked for Defendant; rather, Defendant unlawfully failed to ensure that Plaintiffs received at least the minimum wage rate for each hour of work.

67.    Defendant willfully and intentionally did not compensate Plaintiffs for the total minimum amount of wages they are owed.   There is no bona fide dispute that Plaintiffs are not exempt from the minimum wage provisions of MWHL for the work they performed for Defendant.

68.    Under MWHL, Plaintiffs are entitled to additional wages from Defendant for all hours worked at a rate of pay no less than the federal minimum wage.

### Count III. Violation of the Maryland Wage Payment Collection Act ("MWPCA")

69.     Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

70.     Plaintiffs are entitled to wages under the Maryland Wage Payment Collection Act, Labor and Employment §§3-501 *et. seq.,* which provides that each employer shall pay an employee all wages due for work that the employee performed before the end of employment. Payment must occur on, or before, the day on which the employee would have otherwise been paid.

71.     Plaintiffs have not received compensation from Defendant for all wages owed for work performed before the conclusion of Plaintiffs' employment in accordance with §3-502 or §3-505(a).

72.     Defendant willfully and intentionally did not compensate Plaintiffs for the wages they are owed and continued to violate the MWPCA throughout the entirety of Plaintiffs' employment. There is no bona fide dispute that Plaintiffs are owed wages for work performed while employed by Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and others similarly situated, pray for the following relief:

a)     Designation of this action as a collective action on behalf of Plaintiffs and those similarly situated;

b)     Designation of this action as a class action on behalf of Plaintiffs and all members of the proposed class;

c)     Judgment against Defendant for failure to pay Plaintiffs and those similarly situated in accordance with the standards set forth by the FLSA;

d)     Judgment against Defendant for failure to pay Plaintiffs and those similarly situated in accordance with the standards set forth by MWHL;

e)   Judgment against Defendant for failure to pay Plaintiffs and those similarly situated in accordance with the standards set forth by the MWPCA;

f)   An award against Defendant reflecting outstanding minimum wages owed to Plaintiffs and those similarly situated;

g)   An award of liquidated damages equal to the total amounts of unpaid wages owed to Plaintiffs and those similarly situated, as provided in 29 U.S.C. §216(b);

h)   An award of treble damages equal to the total amounts of unpaid wages owed to Plaintiffs and those similarly situated, as provided in Md. Code Ann. Labor & Employment §3-507.2;

i)   An award of reasonable attorneys' fees and all costs, plus pre-judgment and post-judgment interest, to be satisfied in full by Defendant;

j)   Leave to add additional opt-in or party plaintiffs; and

k)   All further relief deemed just and equitable by this Honorable Court.

## **REQUEST FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request that a jury of their peers hear and decide all possible claims brought on behalf of Plaintiffs and those similarly situated.

Respectfully submitted,

_____/s/_____
Benjamin L. Davis, III, Esq. (29774)
bdavis@nicholllaw.com
Steven M. Lubar, Esq. (26972)
slubar@nicholllaw.com
The Law Offices of Peter T. Nicholl
36 South Charles Street
Suite 1700
Baltimore, Maryland 21201
Phone No.: (410) 244-7005
Fax No.:    (410) 244-1047

*Attorneys for Plaintiffs*