# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CLAUDIA HARBOURT, et al. | : | |
| | : | |
| v. | : | Civil No. CCB-14-3211 |
| | : | |
| PPE CASINO RESORTS MARYLAND, LLC | : | |

## MEMORANDUM

Plaintiffs Claudia Harbourt, Michael Lukoski, and Ursula Pocknett bring this putative class action against PPE Casino Resorts Maryland, LLC ("PPE"), owner and operator of a casino called Maryland Live! ("the Casino"). The plaintiffs allege that they all attended at least part of the Casino's 12-week "dealer school" training course for table games such as blackjack, craps, roulette, and baccarat. They say they were the Casino's employees, and their attendance at the training constituted compensable work under state and federal law. Because the Casino did not pay them for the vast majority of the time they attended the training, they sued to recover what they believe are unlawfully withheld wages. Now before the court is PPE's motion to dismiss their complaint. The motion has been fully briefed, and no hearing is necessary. *See* Local R. 105.6 (D. Md. 2014). For the reasons that follow, the motion to dismiss will be granted.

## BACKGROUND

On November 6, 2012,[1] Maryland's Question 7 authorized the state's casinos to begin operating table games on April 11, 2013, at 12:01 a.m. (Compl. ¶ 15, ECF No. 1.)[2] Following

---

[1] The court takes as true the allegations in the plaintiffs' complaint for purposes of resolving PPE's motion to dismiss. *See, e.g.*, *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014).
[2] Though the complaint fails to mention when Question 7 took effect, the parties agree that it was April 11, 2013, at 12:01 a.m. (*See* Def.'s Mot. Dismiss 1, ECF No. 4-1; Pls.'s Opp. 3, ECF No. 8-1.)

1

Question 7's passage, the Casino sought to recruit and train more than 800 people to staff the 150 table games it planned to operate. (*Id.* ¶ 16.) The Casino advertised its new dealer positions as well as a free, 12-week "dealer school" it planned to run in conjunction with Anne Arundel Community College ("AACC"). (*Id.* at 3, ¶¶ 17, 23.) The Casino also conducted "informational sessions" at Maryland hotels to "provide potential employees with details regarding the dealer positions at [the Casino], and the training program potential employees would need to complete in order to procure the skills needed to operate table games" there. (*Id.* ¶ 17.)

The plaintiffs were among approximately 10,000 individuals who applied for these positions. (*Id.* ¶¶ 18, 21.) Casino employees interviewed the plaintiffs at Marley Station Mall, a strip mall in Glen Burnie, Maryland, around December 2012. (*Id.* at 4, ¶ 18.) These interviews included "a congeniality test, in which a [Casino] employee asked . . . questions in order to assess their personality," as well as "mathematical testing" to see if they could perform basic math "on their feet." (*Id.* ¶ 19.) Following the interviews, the Casino's "agents" asked the plaintiffs "if they would like to attend a course to become a dealer" at the Casino. (*Id.* ¶ 20.) The plaintiffs were told the course would last 12 weeks and would teach them how to conduct table games for the Casino. (*Id.*)

Approximately 831 individuals (including the plaintiffs) were selected to attend the course, (*id.* ¶¶ 21, 22), which began on January 7, 2013, and ended on April 1, 2013, (*id.* ¶ 24).[3] The course was held at Marley Station Mall. (*Id.* at 4, ¶ 18.) It consisted of four hours of daily

---

[3] Although the complaint alleges that the course ended "on April 14, 2013," (Compl. ¶ 24), it also alleges that the course "ran until the beginning of April," (*id.* at 4). A 12-week course beginning on January 7, 2013, would end by April 1, 2013 (if not by March 29). Given the complaint's repeated allegation that the course was 12 weeks long, its reference to the course ending in the "beginning" of April, and that the plaintiffs' opposition to the motion to dismiss states that the course "ended on April 1," (Pls.' Opp. 4-5), the court understands the complaint's single reference to April 14 to be a typographical error.

instruction Monday through Friday, and was offered in four time slots: 8 a.m. to 12 p.m., 12 p.m. to 4 p.m., 4 p.m. to 8 p.m., and 8 p.m. to midnight. (*Id.* ¶ 25.) Though the course was scheduled for 20 hours per week, it extended beyond that because of "numerous delays" attributable to Casino staff. (*Id.* ¶ 26.) The course centered on blackjack, craps, roulette, and baccarat. (*Id.* ¶ 27.)

The plaintiffs allege that the "course was specific to the manner in which" Casino employees were to run these games. (*Id.*) They further allege that all course materials were authored by the Casino, and those attending the course "had absolutely no contact with professors, or any staff, from AACC" because all instructors were Casino employees (who even wore the Casino's uniforms). (*Id.* at 4, ¶ 27.) At various times throughout the course, the Casino "demanded" that the attendees complete forms concerning their employment as dealers, including "direct deposit" and W-2 forms. (*Id.* ¶ 28.) To facilitate the completion of this paperwork the Casino kept a human resources department adjacent to the classrooms at Marley Station Mall. (*Id.* ¶ 30.) The Casino also required attendees to pay $24 for the Casino to obtain their driving records, authorize the Casino to perform criminal and financial background checks, provide their fingerprints and social security numbers, provide confirmation of the highest level of education they had attained, and subject themselves to a drug test. (*Id.* ¶ 29.) All trainees, even those who failed to complete the training program, were given certificates of completion. (*Id.* at 4.)

Ms. Harbourt attended the course for eight weeks but stopped on approximately March 1, 2013, (*id.* ¶ 31), and Ms. Pocknett attended the course for eleven weeks but stopped on approximately March 22, 2013, (*id.* ¶ 33). Mr. Lukoski completed the course and worked at the

Casino until approximately May 1, 2013. (*Id.* ¶ 32.) The Casino did not pay Ms. Harbourt or Ms. Pocknett for any of the time they attended the training, but did pay Mr. Lukoski the minimum hourly wage of $7.25 for the final two days he attended the training. (*Id.* ¶¶ 38, 39.)

The plaintiffs filed suit in this court on October 14, 2014. Their three-count complaint asserts violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Maryland Wage and Hour Law ("MWHL"), Md. Code, Lab. & Empl. § 3-401 *et seq.*, and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code, Lab. & Empl. § 3-501 *et seq.* PPE moved to dismiss on November 11, 2014, and the plaintiffs responded.

## ANALYSIS

When ruling on a motion under Rule 12(b)(6), the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal

citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters*, 684 F.3d at 439 (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

PPE argues the plaintiffs have failed to state a claim because they have not pled facts showing they were employees or performed compensable work. The plaintiffs disagree, and argue their attendance at the training primarily benefited the Casino. As explained below, the plaintiffs' allegations, construed in their favor, fail to show that the primary beneficiary of their attendance at the training was the Casino rather than themselves.

The central issue presently before the court is whether the plaintiffs allege facts sufficient to plausibly demonstrate that they were the Casino's employees within the meaning of the FLSA. "The FLSA provides that employers shall pay employees a minimum hourly wage for all 'hours worked.'" *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 363 (4th Cir. 2011) (citing 29 U.S.C. §§ 206, 207). "The term 'work' is not defined in the FLSA, and courts are left to determine the meaning of the term." *Id.* The FLSA does, however, define "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and "employ" as "to suffer or permit to work," *id.* § 203(g). "Individuals seeking compensation pursuant to the FLSA 'bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for purposes of the Act.'" *Purdham v. Fairfax Cnty. Sch. Bd.*, 637 F.3d 421, 427 (4th Cir. 2011) (quoting *Benshoff v. City of Virginia Beach,* 180 F.3d 136, 140

5

(4th Cir. 1999)). At the same time, however, "[t]he FLSA should be broadly interpreted and applied to effectuate its goals." *Id*.

The seminal case addressing whether a trainee qualifies as an "employee" is *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947). In *Portland Terminal*, a railroad company required applicants for the position of "yard brakeman" to complete seven or eight days of training. *Id.* at 149. Under the supervision of a "yard crew," trainees "learn[ed] the routine activities by observation, and [were] then gradually permitted to do actual work under close scrutiny." *Id.* The applicants' work did "not displace any of the regular employees, who d[id] most of the work themselves, and [had to] stand immediately by to supervise whatever the trainees d[id]." *Id.* at 150. Applicants who completed the training and were "certified as competent" were placed on a list of "a pool of qualified workmen available to the railroad when needed." *Id.*

The Court rejected the claim of a group of former trainees that they were employees and the company violated the FLSA by not paying them during their training time. The Court explained that the FLSA's definition of "employ" as "suffer or permit to work" "was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Id.* at 152. Similarly, Congress did not intend the FLSA to "to penalize [employers] for providing, free of charge, the same kind of instruction at a place and in a manner which would most greatly benefit the trainees." *Id.* The Court concluded that the trainees were not "employees" under the FLSA because the company "received no 'immediate advantage' from any work done by" them. *Id.* at 153.

In *McLaughlin v. Ensley*, 877 F.2d 1207 (4th Cir. 1989), the Fourth Circuit interpreted *Portland Terminal* and concluded that the test for whether a trainee performs the compensable work of an employee is whether the individual or the employer is the "primary beneficiary" of the trainee's labor. *Id.* at 1209. The case also provides a helpful example of where "training" may count as compensable work. In *Ensley*, a snack foods distribution business required applicants to spend five days travelling an ordinary route with an experienced employee as training before they were hired. *Id.* at 1208. The trainees "loaded and unloaded the delivery truck, restocked stores with [the defendant's] product, were given instruction on how to drive the trucks, were introduced to retailers, were taught basic snack food vending machine maintenance, and occasionally helped in preparing orders of goods and with financial exchanges." *Id.* The Department of Labor sued and brought the case to trial, but the district court granted the defendant's motion for a directed verdict. *Id.*

The Fourth Circuit reversed. It noted that "very limited and narrow kinds of learning" took place during the "training." *Id.* at 1210. Rather, "prospective employees were simply helping to service a route, and the instruction they received did not rise to the level that one would receive in a general, vocational course in 'outside salesmanship.'" *Id.* Further, the trainees "were taught only simple specific job functions related to [the employer's] own business." *Id.* Balancing the relative benefits of the "training," the court concluded that the employer "received more advantage than the workers": the employer "obtained employees able to perform at a higher level when they began to receive pay," "received a free opportunity to review job performance, and . . . received the benefit of aid to his regular employees while they performed their normal duties." *Id.* The trainees, by contrast, "received very little" because "the

7

skills learned were either so specific to the job or so general to be of practically no transferable usefulness." *Id.* In addition, "there was no credible evidence that a person who completed the training was not subsequently hired, suggesting that the new workers should be considered at-will employees from the beginning." *Id.* Accordingly, the court concluded that the trainees were "employees" under the FLSA, and thus entitled to minimum wages for one week of work. *Id.*

Here, the plaintiffs identify no work they performed during the 12-week "dealer school" training course. Given that Maryland still barred the operation of table games while the course was running, and the course took place at a strip mall and not at the Casino, this omission is understandable. Rather, the plaintiffs' central argument is that the Casino was the primary beneficiary of their attendance at the training because the Casino needed more than 800 trained dealers ready to staff its table games on April 11, 2013, when the games were set to be legalized. The plaintiffs say the Casino's desperate need for workers is demonstrated by the fact that the Casino offered the training course only once. But the plaintiffs cite no authority to support their theory that a prospective employer becomes the primary beneficiary of a training course when the particular employment positions do not yet exist. Indeed, cases suggest the opposite. *See Petroski v. H & R Block Enters., LLC*, 750 F.3d 976, 980-81 (8th Cir. 2014) (holding that where a defendant tax preparation service required tax professionals to complete 24 hours of off-season "rehire training" to be eligible for later employment during tax season, the professionals were not "employees" because the defendant "receive[d] no immediate advantage from the rehire training"); *Donovan v. Am. Airlines, Inc.*, 686 F.2d 267, 269 (5th Cir. 1982) (holding that where a defendant airline "stagger[ed its] training sessions so that it [was] assured a supply of trained flight attendants and sales agents as needed," and trainees displaced no regular employees, the

trainees were not employees). And in *Portland Terminal* itself the trained applicants simply constituted "a pool of qualified workmen available to the railroad when needed." 330 U.S. at 150. In short, it does not help the plaintiffs that the dealer positions did not yet exist at the time of the training. If anything, it makes it more difficult for them to show that their attendance at the training provided the Casino an "immediate" benefit.

The plaintiffs also allege that the Casino tailored the content of the training course to make it specific to the Casino's future table game operations (though they provide no details as to how it did so). (*See* Compl. at 3 ("[B]ecause different casinos implement different methods concerning how to operate table games, Defendant needed to develop a training course that would ensure that Plaintiffs and others similarly situated would be equipped to perform duties specific to dealing at Maryland Live!.").) This would limit the transferability of the trainees' new skills and thus cut in favor of the conclusion that the Casino was the primary beneficiary of the training. But this allegation does not approach *Ensley*'s observation that trainees "were taught *only* simple specific job functions related to [the employer's] own business" such that anything they learned had "no transferable usefulness." *Ensley*, 877 F.2d at 1210 (emphasis added). Nor would such an allegation be plausible, because Maryland's regulations concerning the operation of table games are extraordinarily detailed, leaving little room for casino-specific duties. *See* Md. Code Regs. 36.05.01 *et seq*. Even without these regulations, however, the plaintiffs' conclusory allegation does not, without more, render plausible the inference that the instruction provided was unique to the Casino.[4]

---

[4] The plaintiffs also rely on their allegation that all trainees, even those who failed to complete the training program, were given certificates of completion (which they characterize as a "sham"). This, the plaintiffs say, suggests that the only purpose of the training was to have enough trained dealers to work in the Casino when table games became legal on April 11, 2013, and that the course had no transferable educational value. But the fact that the Casino needed trained dealers by a particular date does not render it the primary beneficiary of the training, because that is

In addition, the plaintiffs allege that the Casino (1) interviewed potential trainees before selecting them to attend the course; (2) selected a number of trainees equal to the number of dealer positions it wanted to fill; (3) "demanded" that trainees complete a variety of work-related forms; (4) kept a human resources department adjacent to training classrooms; (5) required trainees to pay for and undergo a background check; and (6) required trainees to subject themselves to a drug test. These allegations say little about whether the trainees or the Casino was the primary beneficiary of the training. Rather, they suggest only that the Casino was considering hiring the trainees, which it was permitted to do without paying them. *See, e.g.*, *Donovan*, 686 F.2d at 270 (noting that "[a]lmost all reservation agent trainees [were] offered employment," though they were not entitled to compensation for training time). Neither is it dispositive that the trainees may have "made financial sacrifices in order to attend" the course. *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1028 (10th Cir. 1993).[5] *See also Donovan*, 686 F.2d at 272 ("Trainees make a sacrifice to attend school. But so do all who seek to learn a trade or profession.").[6]

Of course, there are always certain benefits an employer receives from training prospective workers itself rather than relying on a third party: the employer can control the content of the training, observe the trainees, and maintain a pool of qualified potential workers. But these benefits do not comprise the "immediate advantage" to which *Portland Terminal* referred; otherwise, that case would have reached a contrary result. *See Petroski*, 750 F.3d at

---

not the sort of "immediate" benefit *Portland Terminal* and *Ensley* require. And whether or not the certificate had transferable economic value is irrelevant; the question is whether the course had such value. Given the absence of specific allegations as to the course's content, the plaintiffs' certificates argument therefore fails.
[5] Though *Reich* applied a six-factor test not used by the Fourth Circuit, the court made this statement in a discussion of the training's relative benefits.
[6] The plaintiffs' allegation that AACC played little to no role in the course is similarly of little relevance. The issue is who benefited most from the training, not who provided it or structured its content.

981 (noting that marginal economic benefits "are not the type of immediate advantage *Portland Terminal* envisioned"); *Reich*, 992 F.2d at 1028 ("[A]lthough we agree that defendant derived an ultimate advantage by creating a pool of prospective employees trained in its operations, this is the intended result of any employer sponsored training program.").

The allegations the plaintiffs have put forth here are a far cry from the facts described in *Ensley*, where the plaintiff "trainees" performed snack distribution work alongside existing employees. It is true that *Ensley* noted that the employer's ability to "receive[ ] a free opportunity to review job performance" cut in favor of the conclusion that the employer was the primary beneficiary of the "training." 877 F.2d at 1210. But the plaintiffs here do not allege that the Casino had the opportunity to review their job performance, because they do not allege that they performed a job during the training. An employer benefits less from observing a trainee during non-work training than from observing a trainee do the actual work the employee is being hired to do. For similar reasons, it does not aid the plaintiffs' case that *Ensley* noted that trainees should have been considered employees "from the beginning" because they were all subsequently hired.[7] In *Ensley*, the plaintiffs performed work for their employer beginning on their first day of training; here, the only work the plaintiffs allege they performed during the training was their attendance at the training.

Thus, taking the plaintiffs' allegations as true and construing them in their favor, the court finds the plaintiffs have failed to state a claim that they are entitled to compensation for the time they spent in the Casino's training course. This conclusion also extends to the plaintiffs' claims under MWHL, which is the FLSA's "State parallel." *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 242 (D. Md. 2012). Further, in its motion to dismiss, PPE asserted that the

---

[7] It is worth noting that two of the three plaintiffs, Ms. Harbourt and Ms. Pocknett, did not complete the training. (Compl. ¶ 42.) It is unclear, therefore, how their training could have benefited the Casino at all.

plaintiffs' "failure to plead that they are 'employees' under the FLSA mandates dismissal of their . . . MWPC[L] claim[ ] as well." (Mot. Dismiss 11 n.5, ECF No. 4-1.) The plaintiffs did not respond to this argument in their opposition, and the court will dismiss the MWPCL claim on this basis. *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 783 (D. Md. 2010) (a plaintiff's failure to address arguments in a defendant's motion to dismiss a particular claim constitutes an abandonment of the claim).[8]

## CONCLUSION

For the reasons stated above, PPE's motion to dismiss will be granted. A separate order follows.

April 21, 2015                                /S/
Date                                            Catherine C. Blake
                                                 United States District Judge

---

[8] The plaintiffs argue that PPE improperly attached an exhibit to its motion to dismiss, and improperly referenced facts outside the complaint. The court does not rely on the exhibit or on any representations from outside the complaint, and therefore does not resolve the issue of whether they may be considered.