# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

Claudia Harbourt, *et al.*                    *

v.                                            *    Civil Action No. CCB-14-3211
                                                   *consolidated with* CCB-16-0339

PPE Casino Resorts Maryland, LLC,             *

                                              *
                                            ***

## Memorandum

Six years ago PPE Casino Resorts Maryland, LLC, otherwise known as Maryland Live! Casino, ran a program to train table game dealers. The plaintiffs, Claudia Harbourt, Michael Lukoski, and Ursula Pocknett,[1] participated in that program and have since sued Maryland Live! Casino, under, among other laws, the Fair Labor Standards Act. They claim the program constituted "work" under the Act and as a result they should have been paid for their time. The Casino now moves for summary judgment. (ECF No. 58). For the reasons stated below, the Casino's motion will be granted.

## Background

In November 2012, Maryland voters passed a public referendum to legalize table games in the State's casinos. *See* MD. CODE STATE GOV'T 9-1A-01, *et seq.* Maryland Live! Casino seized the new business opportunity. Starting before the referendum was passed, the Casino prepared to open table games. (Pls.' Opp., ECF No. 63, Ex. 2). In addition to transforming its floor space to make room for the tables, the Casino realized it needed about 780 new dealers to staff them. *Id.* The Casino settled on a job training program to fill its needs, (*id.*), and announced

---

[1] Additional plaintiffs are Philip Kroll, Melvin Lorden, Charles Parker, Harvey Robinson, and William Sanders.

1

in widespread advertising the dealer training school at the heart of this case, (ECF No. 63, Ex. 1, Townsend Dep. at 11-12).

Early on the Casino hit a snag: It received notice from the Maryland Higher Education Commission (MHEC) that use of the word "school" in its advertising of the training program was unlawful unless MHEC approved the program or the program was sponsored by an accredited institution. (Defs.' Mot., ECF No. 58, Ex. 6). Because MHEC approval would take too long the Casino sought sponsorship. It found Anne Arundel Community College a willing partner, and the two arranged to jointly administer the program. The parties agreed that the Casino would bear responsibility for, among other things, instructors, scheduling, curriculum (AACC would only review it), and training facilities, and AACC would provide certificates on course completion and register students. (ECF No. 58, Ex. 7).

Enrollment in the dealer school was restricted. The Casino screened applicants for friendliness, hand dexterity, and an affinity for math. (ECF No. 63, Ex. 14, Lukoski Decl. at ¶¶ 6-8; ECF No. 58, Ex. 2, Townsend Dep. at 27). The Casino was serious about those requirements: Of the 8,600 who applied, only 831 were selected for the program. (ECF No. 63, Ex. 1, Townsend Dep. at 31). Operating out of vacant store fronts in Marley Station, the training program opened on January 7, 2013, and was scheduled to run for twelve weeks. (*Id.* at 7). In addition to a mock casino floor on which the trainees would learn, the facility contained an office for the Maryland Casino Live! HR department, (ECF No. 63, Ex. 14, Lukoski Decl. at ¶ 19), and another for the Maryland State Lottery and Gaming Control Agency (SLGCA), (ECF No. 63, SLGCA Dep., Ex. 20. at 9-10, 19-21).

Students in the program learned through observation and practice. Trainees were expected to mirror dealing methods performed by Casino employees: they were to stand up straight; keep their hands on the table; maintain the stance and bearing of dealers; and cut cards and distribute payouts as they were shown. (ECF No. 63, Lukoski Decl. at ¶¶ 13-14; Ex. 16, Kroll Dep. at 62). Throughout the program, Casino employees were monitoring the trainees' progress and sorted them to particular table games depending on the skills they presented. (ECF No. 63, Lukoski Decl. at ¶ 16). The Casino dismissed trainees who fell short of those performance requirements. (*Id.*; ECF No. 63, Sanders Dep., Ex. 12 at 81-82).

The Casino's HR department also prepared trainees for employment. Trainees completed W-2 forms during the program, (ECF No. 63, Kroll Dep. at 74-75),[2] and Local 27 officials, representing the union responsible for casino employees, attended the program at the Casino's request, to recruit trainees and collect authorization cards, (ECF No. 63, Townsend Dep. at 102; Ex. 24 (Local 27 Talking Points); Hipkins Decl., Ex. 4 at ¶¶ 6-7, 9-10, 11-13).

About half-way through the program, the Casino made conditional offers of employment to more than 70% of the program participants, (ECF No. 63, Townsend Dep. at 65-66), though some participants considered these full offers of employment, (ECF No. 63, Kroll Dep. at 73-74). One condition of these offers was obtaining a gaming license from SLGCA. If a participant failed to meet the requirements for a license, such as failing a background check, she was ineligible for employment, and at least one participant was removed from the program for that reason. (ECF No. 63, Townsend Dep. at 40-41; Pocknett Decl., Ex. 21 at ¶ 12).

---

[2] The plaintiffs offer conflicting accounts on the filling out of employment documents during the training program. Some have claimed trainees were required to apply to Maryland Live! Casino to maintain their position in the program. (ECF No. 63, Exs. 13, 14 at ¶ 17). Others state the opposite. (ECF No. 63, Kroll Dep. at 75).

3

The program ended on March 31st, and orientation was held immediately after on April 1st and 2nd. During those two days, trainees were paid to watch HR videos, and complete other employment related requirements, and to brush up on their table games. (*See* ECF No. 63. Lukoski Decl. at ¶ 23). They also tried on uniforms for which they had been fitted weeks earlier. (ECF No. 63, Ex. 26). Only a few days later, on April 11, 2013, the Casino opened its table games to the public.

***

The plaintiffs are all former members of the Casino's dealer program. They filed suit against the Casino in October 2014 under the Fair Labor Standards Act, the Maryland Wage and Hour Law, and the Maryland Wage Payment Collection Act. (ECF No. 1).[3] The court granted the Casino's motion to dismiss, (ECF Nos. 10-11), but the Fourth Circuit reversed, (ECF No. 16). After discovery, and a court order granting class certification under Federal Rule of Civil Procedure 23 for the state law claims but denying a motion for equitable tolling of the statute of limitations under the FLSA, (ECF Nos. 34-35), the Casino now moves for summary judgment, (ECF No. 58).

## Standard of Review

Under Federal Rule of Civil Procedure 56(a) summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). And "[a] fact is material if it 'might affect the outcome of the suit

---

[3] Because the "analysis of the existence of an employment relationship is the same under the MWHL and MWPCL as under the FLSA" the court's holding as to the FLSA applies with equal force to the plaintiffs' state law claims. *Harbourt v. PPE Casino Resorts Maryland, LLC*, 820 F.3d 655, 661 n.5 (4th Cir. 2016).

4

under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## Analysis

The FLSA requires employers to compensate employees "for all work" performed. *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 602 (1944), *superseded by statute on other grounds*, Portal–to–Portal Act of 1947, Pub. L. No. 104–188, 110 Stat.1928. The Act defines "employee" liberally as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and the Supreme Court has found within that broad guidance an intention to cover "trainees, beginners, apprentices, or learners," *Walling v. Portland Terminal Co.*, 330 U.S. 148, 151 (1947). The Supreme Court also has defined "work" and "employment," finding that by those terms Congress "was referring to" their common usage—"as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal*, 321 U.S. at 598.

Thus, a training program is not covered by the Act when it "most greatly benefits" the trainee. *Portland Terminal*, 330 U.S. at 153. In *Portland Terminal*, the Supreme Court also instructed that courts should consider whether the employer "receive[d] [an] 'immediate advantage'" from the training program, and whether there was evidence that the program was "conceived or carried out in such a way as to violate either the letter or spirit" of the Act. *Id.*

Applying *Portland Terminal* in *McLaughlin v. Ensley*, 877 F.2d 1207 (4th Cir. 1989) the Fourth Circuit stated that the general test to be used for determining whether a training program constitutes "work" under the Act is "whether the employee or the employer is the primary beneficiary of the trainees' labor." 877 F.2d at 1209. And when engaging in that inquiry courts should consider: (1) whether the training program was really providing instruction, or whether the trainees were performing as full employees; (2) whether "the skills learned were either so specific to the job or so general to be of practically no transferable usefulness;" and (3) whether there is evidence "suggesting that the [trainees] should be considered at-will employees from the beginning." *Id.* at 1210.[4]

In *Harbourt v. PPE Casino Resorts Maryland, LLC*, 820 F.3d 655 (4th Cir. 2016), the Fourth Circuit, after taking stock of this precedent, identified the question to be decided on remand as whether the training "primarily constituted a benefit to the employer or the trainee." 820 F.3d at 660. The Fourth Circuit also concluded that discovery was needed to determine whether the Casino violated "the spirit" of the FLSA.[5] *Id.* at 661. Considering the Fourth

---

[4] Other circuits have identified similar factors. *See Petroski v. H & R Block Enterprises, LLC*, 750 F.3d 976, 981 (8th Cir. 2014); *Reich v. Parker Fire Protection Dist.*, 992 F.2d 1023, 1027-29 (10th Cir. 1993); *Donovan v. American Airlines, Inc.*, 686 F.2d 267, 271-73 (5th Cir. 1982).

[5] The parties identified six related factors in the *Harbourt* opinion which they have addressed in their memoranda: (1) the transferability of the skills learned; (2) the legitimacy of the training program; (3) whether the training program provided the casino with an entire workforce; (4) whether it is possible to distinguish the two days in April when the trainees were paid from every other day of the program; (5) whether the trainees were performing the

6

Circuit's instruction, the defendant's motion for summary judgment must be granted. As further discussed below, it is not genuinely disputed that the plaintiffs were trainees who never performed the Casino's business; that they learned transferable skills; and that those skills predominated over the Casino-specific instruction. And nothing in the record suggests the plaintiffs were at-will employees, or that the program was conceived in violation of the spirit of the FLSA. In short, neither what the trainees learned, nor what they were promised, nor what they did demonstrates that the training program occurred primarily for the Casino's benefit.

I.

Take the nature of the training program first. Unlike the plaintiffs in *McLaughlin*, who learned by driving and unloading trucks, and restocking "retail store shelves and vending machines," and were no doubt "helping [the employer] to distribute his snack foods," 877 F.2d at 1210, the trainees in the Casino's dealer program were students throughout the course. For twelve weeks, trainees, surrounded by instructors and fellow students and fake chips, learned to stand and deal cards. During this time, they did not take a single actual bet, nor did they shuffle, interact, or play as dealers. In fact, the trainees simply could not have provided the sort of benefit the trainees in *McLaughlin* provided their employer even if the Casino wished them to—table games remained illegal throughout the training program. Unquestionably, the Casino did not "receive[] the benefit of aid to [its] regular employees" from unpaid trainees. *Id.*

The plaintiffs claim the Casino's inability to staff gaming tables with trainees is precisely why the training program was primarily for the Casino's benefit. The former table games ban meant the Casino lacked preexisting employees to staff its tables and thus was required to rely on the pool of dealers generated by its training program. But the benefit this provided to the

---

employer's business; and (6) whether the trainees were promised jobs. (*See, e.g.*, Defs.' Mot., ECF No. 58 at pp. 1-5).

7

Casino—potential recruits—is no different from the benefit provided by any other training program, and thus without more cannot constitute grounds for holding that the Casino received the principal benefit of the program, without transforming every training program into "work" under the FLSA. This interpretation of the FLSA would run counter to established precedent. *See Portland Terminal*, 330 U.S. at 151-52 (finding that a training program was not "work" under the FLSA because it provided no "immediate advantage" to the employer).

II.

The training program here is unlike *McLaughlin* in another way: The skills it taught were not "either so specific to the job or so general to be of practically *no transferable usefulness*." *McLaughlin*, 877 F.2d at 1210 (emphasis added). Trainees in the program were taught to deal table games uniformly popular, and popular because of their uniformity. Blackjack in Maryland is the blackjack of Nevada. It should be unsurprising then that the Casino's written training curriculum mirrored curricula of similar programs across the country, (ECF No. 58, Ex. 4), and that experts, and the trainees themselves, acknowledged that the program's curriculum taught them to deal card games at any casino in the country, (ECF No. 58, Moore Aff., Ex. 53 at ¶¶ 5-6; Exs. 54-59 at ¶¶ 5-6; Lorden Tr. Ex. 9 at 79-80). Indeed, at least 84 of the trainees who completed the Casino's program were hired by other casinos as dealers, (ECF No. 58, Foschini Aff., Ex. 41 at ¶ 7; Metz Aff., Ex. 3 at ¶ 13), and the Maryland Lottery and Gaming Control Commission found the curriculum "consistent with those utilized by all other licensed facility operators in the State that have offered table games," (ECF No. 58, Eaton Aff., Ex. 1 at ¶ 11). The program also was partly administered by Anne Arundel Community College, and trainees received a certificate on completion of the program, suggesting the trainees learned skills they could market off the floor of Maryland Live!.

To be sure, the record shows that the trainees also learned Casino-specific ways of dealing cards. Trainees learned on a replica of Maryland Live!'s casino floor, and were required to adopt the Casino's professional policies that dictated how a dealer must hold their hands, access their personal items, (ECF No. 63, Harbourt Decl., at ¶¶ 13-14), how to dress and groom, and methods for shuffling cards, using betting instruments, capping bets, and flipping cards, (ECF No. 63, Sanders Dep. at 53-56). Students were told they were learning the "Maryland Live! way." (ECF No. 63, Lorden Dep. at 66). All of this is thoroughly illustrated in the plaintiffs' exhibits, and thus there is no doubt that the Casino put its own gloss on the table games learned by the trainees. But dress codes and shuffling methods are incidental features of a substantive skill. Take away the "Maryland Live! way" and the trainees are still left with table game know-how, a skill transferable to competing casinos. Indeed, "[a] training program that emphasizes the prospective employer's particular policies is nonetheless comparable to vocational school if the program teaches skills that are fungible within the industry." *Reich*, 992 F.2d at 1027-28. Here, there is no evidence that this casino-specific training overwhelmed the core dealer skills transferable across casinos. And the record certainly does not show that the "Maryland Live! way" rendered the remaining learned skills of no transferable usefulness.

Some plaintiffs claim that even if core dealer skills are generally transferable they were not so here because the Casino failed to properly teach those skills. (ECF No. 63, Harbourt Decl. at ¶ 20). But the test for transferability of a skill cannot hinge on how well a trainee was instructed; if it did, "work" under the FLSA would be defined not in terms of the relative distribution of its benefits, as the case law requires, but on the quality of a trainee's instruction. The FLSA is not insurance for poor teachers, but protection from exploitative labor practices. On that latter issue, poor instruction, at least alone, is irrelevant.

The plaintiffs also quibble with the Casino's written materials. They argue that very few trainees actually received those materials and thus they have no bearing on what was actually taught during the program. (ECF No. 63, Lukoski Decl. at ¶ 13). But of course the written materials may have formed the core of the Casino's instruction even if they were not widely distributed. Even if that were not true, however, the written materials merely reaffirm what is already obvious: any instruction on casino table games is transferable because table games are played one way and played everywhere. As a result, trainees learned more than "simple specific job functions related to [their employer's] own business." *McLaughlin*, 877 F.2d at 1210. The plaintiffs have not provided any evidence to dispute that fact, and failing to do so they cannot bear their burden of showing that the trainees received no transferable skills from attending the Casino's dealer training program.

### III.

All of this also cuts against another *McLaughlin* factor—whether the trainees were at-will employees all along. The trainees did not perform the duties of a full employee, nor was their training so specific to the Casino's business as to be of no transferable usefulness. Nevertheless, the plaintiffs argue that several other features of the program—that the Casino hired a substantial number of dealers from the pool of trainees, that trainees were implicitly promised employment, and that the trainees were paid on April 1st and 2nd—suggest that the trainees were really employees from the beginning. And if they were employees, the plaintiffs argue, the training program benefited the Casino much more than its unpaid trainees. The record does not support this argument.

To be sure, the Casino did hire members of the training program to serve as dealers, 503 or 68% of them in fact. But that means 32% of the class, nearly one-third of it, were not hired.

The training program was thus no sure bet of employment. Nor were those 503 employees sufficient to cover the Casino's needs. It also hired 238 experienced dealers, representing 32% of the Casino's new hires, to staff its tables. (ECF No. 58, Townsend Dep. at 121-23). The record does not show that the Casino benefited from "an entire workforce of over 800 dealers trained to operate table games," *Harbourt*, 830 F.3d at 660, and, without more, merely hiring a portion of the program participants is not sufficient to trigger the FLSA, *see Portland Terminal*, 330 U.S. at 149-50 (holding that a training program did not constitute "work" even though trainees who completed "their course of instruction satisfactorily and [were] certified as competent . . . [were] included in a list from which the company c[ould] draw when their services [were] needed").

The numbers also undermine the plaintiffs' contention that trainees were implicitly promised employment. Besides of course the fact that not every trainee was hired, over again the Casino made clear that the program guaranteed neither pay nor employment. The program application stated that admission "does not guarantee graduation, [or] employment," (ECF No. 58, Ex. 6), an information session reaffirmed as much, (ECF No. 58, Ex. 68), and the offers received by students for employment beginning on April 1, 2013, were conditioned on students passing a background check and drug test, obtaining a gaming license, completing the dealer school, and passing an audition, (ECF No. 58, Exs. 46-50). Indeed, the plaintiffs themselves understood that they would not be compensated or guaranteed employment as a result of their participation in the dealer school. (ECF No. 58, Harbourt Decl. Ex. 65 at ¶ 13; Townsend Dep. at 33, 138).

Despite the Casino's explicit disclaimers, the plaintiffs claim a few HR representatives promised employment on completion of the training program. (*See, e.g.*, ECF No. 58, Harbourt

Decl., at ¶ 18).[6] This testimony does little, however, to move the needle, as even the plaintiffs acknowledge that their "guaranteed" employment was conditioned on a successful audition. (*Id.*) The plaintiffs also argue that trainees were required to complete employment documents, including W-2s and paperwork to facilitate a background check, and authorization cards to join Local 27. (ECF No. 63, Harbourt Decl. at ¶ 19). But again none of these requirements is evidence that the trainees were really at-will employees. The completed documents were invariably *pre-employment* forms and the remaining practices are entirely consistent with conditional offers of employment. Thus, the record does "not indicate that the [Casino] ever undertook to pay, or the trainees ever expected to receive, any remuneration for the training period." *Portland Terminal*, 330 U.S. at 150. Rather the defendant desired, but did not guarantee, that trainees would become employees on completing their training.

That leaves April 1st and 2nd, orientation days trainees were paid to attend. The plaintiffs argue that these days were indistinguishable from every other day of the program. Trainees still practiced table games, filled out paperwork as they had before and, though they tried on uniforms, trainees were fitted for those uniforms weeks earlier. Thus, if the Casino thought pay was due for those two days then, in the plaintiffs' view, pay was due all program long.

But the undisputed record recounts a different two days, ones marked by significant differences from the twelve weeks that had come before. For one thing, the orientation days were not just the last two days of the training course, but came after the course had ended on March 31, 2013, and the participants had completed their training. (ECF No. 63, Townsend Dep. at 79). For another, those who received pay were considered full employees by the Casino. More than a

---

[6] In a declaration, Nikolaos Kastanaras, a former trainee, did state: "[I]f I recall correctly, and I normally do, we were told/led to believe that employment was, essentially, guaranteed." (ECF No. 63, Ex. 34). Far from unequivocal, and failing to explain what "essentially" guaranteed means, this one sentence does not create a genuine dispute on this matter.

change in title only, employment meant that the person had completed an audition and proved they were prepared for work on the casino floor. (*Id.* at 79-80; Lorden Dep. at 107).

More still, the plaintiffs' account misses how orientation reflected the plaintiffs' new relationship with the casino. Program participants could still practice their table games, but they were not forced to, and were not still being trained. (ECF No. 63, Townsend Dep. at 82; Lorden Dep. at 109; Lukoski Decl. at ¶ 23; Kroll Dep. at 79). And while trainees were required to complete paperwork during the program, orientation was particularly employment-focused: participants watched HR videos, reviewed benefits, and received sexual harassment training. (ECF No. 63, Townsend Dep. at 82; Lorden Dep. at 114). There was even a family night, (ECF No. 63, Kroll Dep. at 79), and experienced dealers—dealers trained outside the Casino's program—hired to staff table games also attended, (ECF No. 58, Townsend Dep. at 124). In the plaintiffs' own words then, orientation "was different than the training," (ECF No. 63, Lorden Dep. at 142), "[i]t was like a new hire type deal," (ECF No. 63, Kroll Dep. at 82). The record leaves no doubt that is true.

Orientation was thus twice separated from the training program. It was attended only by employees who met certain performance conditions, and entailed employment-based activities. Accordingly, the record cannot bear the plaintiffs' assertion that if paid for April 1st and 2nd, all trainees should have been paid for the twelve weeks before then.

Of course the Casino did receive benefits from the program. Through it the Casino created a pool of workers from which it could and did hire dealers to staff its gaming tables. And the pool of workers was made possible by requiring trainees to complete certain forms. But the inquiry for whether a training program constitutes "work" for the purposes of the FLSA is not whether the employer received *any benefit* from the program, but rather whether the employer

13

received the *principal benefit*. The trainees having never performed the Casino's business, having never been promised employment with the Casino, and having learned transferable skills, no doubt received the principal benefit of the parties' relationship.

IV.

Last, the plaintiffs claim their training was "either conceived or carried out in such a way as to violate . . . the spirit of the minimum wage law," *Portland Terminal*, 330 U.S. at 153, because the Casino's partnership with Anne Arundel Community College was a sham created to lure potential dealers to the program, (ECF No. 63 at pp. 23-30).

To support their argument the plaintiffs emphasize AACC's lack of involvement in the training program. Anne Arundel Community College had little to do with the program's curriculum, the program was not held on AACC's campus, the partnership was quickly formed, (ECF No. 63, Ex. 10), and the Casino bore the brunt of its responsibilities: it provided the facility and instructors, and AACC provided only the certificates of completion, (ECF No. 63, Ex. 8). The program also deviated from other dealer classes provided by AACC, by virtue of its location and the restrictions the Casino imposed on enrollment. (ECF No. 63, Harland-White Dep., Ex. 9 at 7, 62-63). All of this undisputedly shows that AACC was loosely partnered with the Casino, and that the Casino's use of the class as a pool from which to draw employees made the class different from other dealer classes offered by the College. What it does not show, however, is that the class was a sham.

To do that, the plaintiffs had to submit evidence that the Casino's training program "had nothing to do with any college," or was disguised "as a school for the purpose of not paying the trainees." *Harbourt*, 820 F.3d at 661 (internal quotation marks omitted). On these matters the record is silent. There is no evidence that the Maryland Higher Education Commission

14

disapproved of the program. To the contrary, the partnership was created to satisfy MHEC requirements, and there is nothing to suggest the nature of the Casino's and AACC's relationship violated that instruction. And even if AACC was loosely involved and the Casino's program was unlike other dealer programs offered by the College, none of that suggests there was no real partnership, or that the whole thing was a sham. Indeed, the plaintiffs fail even to provide a standard by which to judge the legitimacy of a private partnership with a public education institution. And on top of all this are the certificates successful applicants received from AACC acknowledging their completion of the dealer course—unequivocally suggesting that the partnership was real and that the college believed the program was a legitimate class. In short, the record contains ample evidence of the program's legitimacy and offers not a single hint that AACC's partnership with the Casino was a fraud. Accordingly, the plaintiffs have not provided evidence that the Casino's dealer program violated the spirit of the FLSA.

V.

To summarize, the Casino's training program neither principally benefited the Casino nor violated the spirit of the FLSA. The trainees were truly being trained and not once were tasked with performing the responsibilities of a Casino employee. The skills they learned, although influenced by the "Maryland Live! way," were at their core widely transferable to any casino offering table games, and the Casino neither hired every trainee, nor promised trainees pay or employment. Indeed, the compensation paid to trainees on April 1st and 2nd reflected pre-employment orientation that was not the same as the prior instruction. And the record fails to offer any evidence that the Casino was not truly partnered with AACC or that their partnership was a sham all along. None of these indicia of an FLSA violation—set forth by the Fourth Circuit and Supreme Court precedent—have been genuinely disputed by the plaintiffs. Instead,

15

the plaintiffs have shown that the Casino received some benefit from their program—the Casino created a pool from which to draw dealers— but if that were enough to say the trainees were "working" for the Casino, the FLSA would then apply to every training program. Neither common sense nor precedent supports such a result. Rather, the proper inquiry is whether the Casino received the *principal benefit* of the training program. The undisputed record shows that it did not.

## Conclusion

For the reasons stated above, the defendant's motion for summary judgment will be granted. A separate order follows.

8/2/18
Date

/s/ CCB
Catherine C. Blake
United States District Judge